# UNITED STATES DISTRICT COURT
for the
District of New Mexico

**FILED**
United States District Court
Albuquerque, New Mexico

Mitchell R. Elfers
Clerk of Court

In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* )
                                                        )     Case No. **23 MR 2200**
One black Motorola Phone cell phone bearing IMEI )
354812420880668 and one black Samsung cell phone )
          with an unknown IMEI )

**APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS**

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A (incorporated by reference).

located in the _____ District of _____New Mexico_____, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B (incorporated by reference).

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
    ☑ evidence of a crime;
    ☐ contraband, fruits of crime, or other items illegally possessed;
    ☑ property designed for use, intended for use, or used in committing a crime;
    ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 USC §§ 841(a)(1),(b)(1)(A) | Possession with Intent to Distribute five (5) kilograms and more of a mixture or substance containing a detectable amount of cocaine |
| 21 USC §§ 846 | Conspiracy |

The application is based on these facts:
See the attached affidavit of HSI Special Agent Victor Avila, which is incorporated by reference and has been reviewed and approved by AUSA Timothy Vasquez.

    ☑ Continued on the attached sheet.
    ☐ Delayed notice of _____ days *(give exact ending date if more than 30 days: _____)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Victor Avila, HSI Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
telephonically sworn and electronically signed *(specify reliable electronic means)*.

Date: November 29, 2023

_____
*Judge's signature*

City and state: Albuquerque, New Mexico      Jennifer M. Rozzoni, U.S. Magistrate Judge
*Printed name and title*

## ATTACHMENT B

### Items to be Seized

1. All evidence on the **Subject Devices** described in Attachment A that relates to possession with intent to distribute five (5) kilograms and more of a mixture or substance containing a detectable amount of cocaine in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A) and 21 U.S.C. §§ 846 Conspiracy including:

   i. Pictures and videos of controlled substances, including cocaine, fentanyl and methamphetamine, as well as pictures and videos of supplies, instruments, and paraphernalia used for packaging processing, diluting, weighing, and distributing controlled substances;

   ii. Lists of customers and related identifying information;

   iii. Types, amounts, and prices of drugs trafficked as well as dates, places, and amounts of specific transactions;

   iv. Any information related to sources of drugs (including names, addresses, phone numbers, or any other identifying information);

   v. Any information recording either Sabas Enrique SALOMON-Castro's and/or Samuel ASTORGA-Urias schedule or travel;

   vi. All bank records, checks, credit card bills, account information, and other financial records;

   vii. Pictures and videos of firearms and ammunition;

   viii. Books, records, receipts, notes, ledgers, records and documents related to the distribution of controlled substances, and the sale or purchase of firearms and ammunition;

ix. Pictures and videos of proceeds of drug trafficking, or the sale of firearms, including currency, jewelry, vehicles, and other assets or financial records;

x. Photographs, videos, and digital images depicting either Sabas Enrique SALOMON-Castro's and/or Samuel ASTORGA-Urias, and persons yet to be identified, with controlled substances, firearms, or ammunition; and

xi. Communications between either Sabas Enrique SALOMON-Castro's and/or Samuel ASTORGA-Urias and persons yet to be identified discussing drugs, drug trafficking, firearms, or ammunition, to include communications from email accounts, text messages, voice messages, picture messages, messaging applications, and any other web or cellular based communications platforms.

2. Evidence of user attribution showing who used or owned the **Subject Devices** at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF ONE BLACK MOTOROLA PHONE CELL PHONE BEARING IMEI 354812420880668 AND ONE BLACK SAMSUNG CELL PHONE WITH AN UNKNOWN IMEI | Case No. _____ |

**AFFIDAVIT IN SUPPORT OF AN
APPLICATION UNDER RULE 41 FOR A
WARRANT TO SEARCH AND SEIZE**

I, Victor Avila, Special Agent with the Department of Homeland Security, Homeland Security Investigations ("HSI"), being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1. I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property—two electronic devices—which are currently in law enforcement possession, and the extraction from that property of electronically stored information described in Attachment B. For the reasons stated herein, I believe there is probable cause to conclude that the electronic devices at issue contain records or information that will be evidence of or relating to violation of possessing with intent to distribute five (5) kilograms and more of a mixture or substance containing a detectable amount of cocaine in violation of 21 U.S.C. § 841(a)(1), (b)(1)(A) and 21 U.S.C. §§ 846 Conspiracy.

2. I am an investigator or law enforcement officer of the United States within the meaning of Title 18, United States Code, Section 2510(7), that is, an officer of the United States who is empowered to conduct investigations of, and to make arrest for, the offenses enumerated in Titles 8, 18, 19, 21, and 31 of the United States Code and other related offenses.

3. I am a Special Agent ("SA") with the Department of Homeland Security, Immigration and Customs Enforcement, Homeland Security Investigations ("HSI"), in Albuquerque, New Mexico, and have been employed as such since April of 2018. Prior to my employment with the Department of Homeland Security, I was a Border Patrol Agent with the United States Customs and Border Protection from July 2012 until April 2018.

1

4. I successfully completed eleven weeks of Criminal Investigator Training at the Federal Law Enforcement Training Center in Glynco, Georgia (FLETC). In addition, I have completed seventeen weeks of Border Patrol Agent Training with United States Border Patrol Academy at FLETC (Artesia, NM). I have a Bachelor's Degree in Social Science from The Evergreen State College and a Master of Criminal Justice Administration and Security Degree from University of Phoenix.

5. I have received extensive training and practical experience pertaining to federal criminal procedure, federal criminal statutes, United States immigration and nationality law, United States customs laws and regulations, and other federal and state laws, including but not limited to alien smuggling, human trafficking, fraudulent document manufacture and sales, the importation and distribution of controlled substances, firearms, commercial fraud, counter-proliferation investigations, and conspiracy.

6. I have also acquired knowledge and information about such offenses, and the various means and methods by which they are furthered, from numerous sources, including formal and informal training from other law enforcement officers, investigators, and Special Agents; interviews of informants and arrestees; and interviews of other knowledgeable individuals.

7. Through my training and experience, I have learned that:

   a. Drug traffickers often store names, addresses, telephone numbers, email addresses, or other pertinent codes and or contact information for their current or past illegal drug source(s) of supply, customers, or criminal associates in the electronic memory of their wireless telephones, tablets, digital cameras, portable media players, and personal digital assistants ("PDAs").

   b. Drug traffickers often store photographs of drugs, vehicles, locations, or drug associates in the electronic memory of their wireless telephones, tablets, digital cameras, portable media players, and PDAs.

   c. Drug traffickers often communicate with their illegal drug source(s) of supply, customers, or criminal associates through text message, wireless telephone application, and/or email from their wireless telephones, tablets, portable media players, and PDAs. Accordingly, pertinent communications are often stored in the electronic memory of wireless telephones, tablets, portable media players, and PDAs.

d. Drug traffickers must maintain and have quick access to large amounts of United States currency or other liquid assets in order to maintain and finance their ongoing drug business. As such, they often store bank account information, drug ledgers, or lists of where assets are stored in the electronic memory of wireless telephones, tablets, digital cameras, portable media players, and PDAs.

e. Drug traffickers often make use of multiple wireless telephones and other electronic devices, such as tablets, in an effort to thwart law enforcement detection. They believe that spreading communications over multiple devices will make it more difficult for law enforcement to intercept their communications.

f. Drug traffickers, like many other people in today's digital society, make use of computers and tablets to conduct their business. Like other people, drug traffickers need ready access to their important records that are stored electronically. These records can include ledgers of money paid and owed, customer lists, names and contact information of co-conspirators and associates, and photographs and videos displaying drugs in the trafficker's possession. Many people in today's society, including drug traffickers, make use of portable computer drives, commonly referred to as USB drives, flash drives, or thumb drives, to access important records when using a computer.

g. Those engaged in the transportation of drugs will often be given an address where the drugs are to be picked up and where the drugs are to be delivered. In many instances, the drug transporter is not familiar with these addresses and is being paid to act as a courier between two locations. In these circumstances, I believe that couriers use the same methods that any other person would use to locate an unfamiliar address. These methods would include, but are not limited to, using mapping programs contained within wireless telephones or tablets, and/or programming the address into GPS navigation devices.

h. It is important for agents to not only seize evidence of the crimes at issue, but to also seize any evidence that could demonstrate to whom the evidence can be attributed. I know from my training and experience that electronic devices can be used by multiple individuals. Oftentimes, friends, family members, co-conspirators, and/or associates will all make use of the same electronic device. For

3

this reason, it is necessary to seize any information since the inception of the device's use that could demonstrate who has possessed the device, who has used the device, and/or who has created the records, information, or evidence that could establish violations of the statutes listed herein.

8. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses.

9. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## IDENTIFICATION OF THE DEVICES TO BE EXAMINED

10. The property to be searched consists of two cellular telephones, as described in Attachment A and B (hereafter referred to as the "Subject Devices") and is identified as follows:

    a. One black Motorola cell phone bearing IMEI 354812420880668.
    b. One black Samsung cell phone with an unknown IMEI.

11. The devices above will be referred to as the **Subject Devices**. The **Subject Devices** are located at the HSI Albuquerque field office located at 5441 Watson Drive SE, Albuquerque, NM.

12. The applied-for warrant would authorize the forensic examination of the **Subject Devices** for the purpose of identifying electronically stored data particularly described in Attachment B.

## PROBABLE CAUSE

13. On November 25, 2023, New Mexico State Police Officer and HSI Task Force Officer (TFO) Julian Armijo, was on duty in full uniform, displaying his badge of office. Officer Armijo was in a fully marked New Mexico State Police Unit # 469, within the county of Cibola, State of New Mexico. At approximately 10:35 a.m. Officer Armijo was traveling east bound on Interstate 40 (I-40). He observed a gray in color passenger car traveling ahead of his marked unit in the right lane of traffic. While conducting the same direction traveling radar, Officer Armijo observed the vehicle traveling 84 mph in a posted 75 mph zone. As Officer Armijo continued to approach the vehicle, he observed the vehicle have an Arizona registration and license plate of MKA5PR. Officer Armijo positioned his marked unit behind the vehicle and activated his

4

emergency lights. Officer Armijo initiated a traffic stop on Interstate 40 at approximately the 84-mile post.

14.     Officer Armijo exited his marked unit and approached the vehicle on the passenger side. Officer Armijo contacted the driver, identified later as Sabas Enrique SALOMON-Castro (hereinafter referred to as "SALOMON") and the front passenger, later identified as Samuel ASTORGA-Urias (hereinafter referred to as "ASTORGA"). Officer Armijo advised SALOMON of the reason for the traffic stop requested his driver's license, registration, and proof of insurance. SALOMON provided the requested documents, and Officer Armijo advised him he was going to provide him a written warning. Officer Armijo asked SALOMON to step out of the vehicle and follow him back to the marked unit. For officer safety, Officer Armijo patted down SALOMON to ensure he didn't have any weapons. Officer Armijo asked SALOMON to have a seat in the front passenger seat of the marked unit.

15.     Once in his marked unit, Officer Armijo began filling out the written warning. Officer Armijo questioned SALOMON as to where he was going, and SALOMON replied, "to New Mexico." Officer Armijo asked SALOMON which part of New Mexico he was traveling to, and SALOMON replied he did not know where. Officer Armijo questioned SALOMON where he and ASTORGA came from, and SALOMON replied, Phoenix Arizona. SALOMON indicated he and ASTORGA were headed to New Mexico for work. Officer Armijo asked SALOMON who the front passenger in the vehicle was and SALOMON replied, he was a friend from work. Officer Armijo asked SALOMON how long he had known his friend and SALOMON replied, "about a month." Officer Armijo asked SALOMON who the vehicle's owner is because Officer Armijo noticed SALOMON was not the registered owner. SALOMON replied, the vehicle belonged to his brother who was living in Phoenix Arizona. Officer Armijo asked SALOMON what his brother's name was, and SALOMON replied, "Jesus Salomon Castro." Officer Armijo questioned SALOMON further about his itinerary and length of stay in New Mexico. SALOMON replied, he was going to be working in New Mexico and he could not provide a length of time. Officer Armijo advised SALOMON he was going to check some numbers on the vehicle and asked SALOMON to step out and stand by the front passenger tire of his marked unit.

16.     As Officer Armijo was conducting a vehicle identification number (VIN) check, he contacted ASTORGA. Officer Armijo advised ASTORGA he had some questions for him and

if he would be willing to speak with him. ASTORGA replied in the affirmative. Officer Armijo questioned ASTORGA about his itinerary. ASTORGA replied he was traveling to New Mexico. Officer Armijo asked ASTORGA where in New Mexico he and SALOMON were traveling to, and ASTORGA replied he didn't know he and was just riding along. Officer Armijo asked ASTORGA who the driver is, and ASTORGA replied that SALOMON is his friend. Officer Armijo asked ASTORGA what SALOMON's name is, and ASTORGA replied that he didn't know. Officer Armijo asked ASTORGA how long he had known SALOMON and he said for "a month." Officer Armijo, believing ASTORGA and SALOMON had conflicting stories, returned to his marked unit, and finished the written warnings for SALOMON. Officer Armijo provided SALOMON all his documents, including the written warnings for speeding and no driver's license. Officer Armijo handed these documents to SALOMON and stated in the Spanish language, "es todo (that's it)," to which SALOMON replied in the Spanish language, "muchas gracias (thank you very much)."

17. Officer Armijo believing a crime was afoot, and prior to SALOMON's departure from the marked unit, informed SALOMON he had some additional questions for him. SALOMON replied, "Mande?" This is a polite way to state, "what?" Officer Armijo interpreted SALOMON's gesture as a willingness to answer further questions.

18. Officer Armijo asked SALOMON about his intended length of stay in New Mexico, to which SALOMON replied, a month. Officer Armijo asked SALOMON about his and ASTORGA's reason for being in New Mexico, to which SALOMON replied, for work. Officer Armijo asked SALOMON about his family in Phoenix to which he replied, he only had a brother living there. Officer Armijo asked SALOMON who the vehicle belonged to, and he replied, his brother. Officer Armijo asked SALOMON if there was anything illegal in the vehicle to which he replied in the negative. Officer Armijo asked if there was any marijuana, cocaine, methamphetamines, heroin, or fentanyl to which SALOMON replied in the negative. Officer Armijo asked SALOMON if there were any firearms or large amounts of money over $10,000 to which he replied in the negative. Officer Armijo advised SALOMON he wanted to search the vehicle and if that was ok to which SALOMON replied in the affirmative. Officer Armijo told SALOMON he wanted to search the entire vehicle, inside and out, to which SALOMON replied in the affirmative. Officer Armijo asked SALOMON if he had any luggage in the vehicle and SALOMON replied, a black bag. Officer Armijo asked him if he could search the black bag to

which SALOMON replied in the affirmative. Officer Armijo asked SALOMON if the passenger had luggage and he replied, yes. SALOMON was asked to stand off to the side of the road and away from the vehicle and traffic.

19. Officer Armijo contacted ASTORGA, who was seated in the vehicle, and asked him to step out of the vehicle. Officer Armijo asked ASTORGA if there were any drugs in the vehicle and he replied in the negative. Officer Armijo asked ASTORGA if he had luggage in the vehicle to which ASTORGA replied in the affirmative. Officer Armijo asked for consent to search ASTORGA's luggage and he replied in the affirmative. Officer Armijo asked ASTORGA to stand off to the side of the road and away from traffic and the vehicle while it is searched. Officer Armijo began a systematic search of the vehicle by searching the rear seat area first. Officer Armijo located a large bag behind the driver seat on the floorboard. Inside the bag, there were several large vacuumed sealed brick-like bundles. Based on his training and experience, the bundles appeared to be narcotics. Officer Armijo drew his department issued duty weapon and ordered SALOMON and ASTORGA to put their hands up. SALOMON and ASTORGA were detained, placed in handcuffs, and escorted to the passenger side of Officer Armijo's marked unit to await a secondary officer who was enroute to assist.

20. Officer Armijo returned to search the rear seat of the vehicle and located a second large bag behind the passenger seat on the floorboard. The bag also contained several large vacuumed sealed brick-like bundles. Based on his training and experience, these bundles appeared to be additional narcotics.

21. SALOMON, ASTORGA, the vehicle, and the narcotics were transported to the New Mexico State Police office in Milan, New Mexico for further processing. While at the NMSP office, the black Motorola cell phone bearing IMEI 354812420880668 continued to receive phone calls, messages, and navigation software prompts. Officer Armijo asked SALOMON if this was his cell phone to which he replied in the affirmative. Officer Armijo tried to access the cell phone to place it on airplane mode but was unable to access it without the PIN. ASTORGA's black Samsung cell phone was accessed and placed on airplane mode but powered down due to energy depletion. SA Avila arrived at the NMSP Office shortly after and helped process the evidence. SA Avila seized the Subject Devices and placed them inside an evidence bag for transportation back to the HSI Albuquerque Office.

22. There were twenty-two (22) black, vacuum sealed bundles weighing a total of 26.57 kilograms. SA Avila and Officer Armijo carefully field tested one bundle, which resulted positive for cocaine. SALOMON and ASTORGA were transported to the Cibola County Detention Center and charged for Possession with Intent to Distribute and Conspiracy.

23. On November 29, 2023, SA Avila received information from HSI Seized Property Specialist (SPS) D. Barkley that two (2) of the twenty-two (22) black, vacuum sealed bundles were white powder fentanyl (weighted 2.2 kilograms and field tested positive) and not cocaine.

24. Based on my training and experience, I know that people who transport controlled substances often collect the controlled substances at locations they are unfamiliar with and must often deliver them to other locations with which they are not familiar. I know that these individuals are often given strict timetables and schedules for their trips. I know that they will often rely on Global Positioning Systems ("GPS") to guide them to the locations where they are to pick up the controlled substances and provide them with efficient routes in order to reach their final destinations on schedule. I know that smart devices such as the **Subject Devices** can be used with a variety of GPS and navigation programs, which provide users with directions to and from specific locations. Therefore, I believe the **Subject Devices** may have been used by either SALOMON or ASTORGA to find the location where they received the controlled substances and the location to which they were supposed to deliver them and/or the other people involved.

25. Based on my training and experience, I know that individuals involved in trafficking controlled substances often use their wireless phones and tablets to communicate with each other regarding their crimes. These individuals can use their wireless telephones and tablets to communicate through telephone calls, text messages, e-mails, and through mobile applications such as Facebook Messenger, WhatsApp, Kik Messenger, Instagram, Snapchat, and others. I know that these individuals often document their co-conspirators as contacts in their wireless telephone's contact list or phonebook and document activities such as meetings, deliveries, and payments in their phone's or tablet's calendar or notepad application. I know that these individuals often use their wireless phones or tablets to access their bank accounts and interact with funds that were derived from their criminal activities as well as to transfer those funds using applications such as Zelle, Quickpay, PayPal, Venmo, and others. I know that individuals will often use the GPS capabilities of their wireless telephones or tablets to guide them to locations at which they

engage in their criminal activities. For these reasons, I believe the **Subject Devices** likely contains evidence of SALOMON and ASTORGA's drug trafficking activities.

26. Based on the above-mentioned details, I believe the **Subject Devices** likely contains information relating to violations of 21 U.S.C. §§ 841(a)(1), (b)(1)(A), that being in possession with intent to distribute 5 kilograms and more of a mixture or substance containing a detectable amount of cocaine. The information may include details on how and where SALOMON and ASTORGA obtained the seized illegal drugs, where the seized drugs were destined, where additional evidence may be located, who assisted SALOMON and ASTORGA in obtaining the seized drugs, who supplied the drugs, and whether there was an intended recipient of the drugs. This information could include, but is not limited to:

   a. Lists of customers and related identifying information;
   b. Types, amounts, and prices of drugs trafficked, as wells as dates, places, and amounts of specific transactions;
   c. Photographs or videos of the drug traffickers, their co-conspirators and the property and assets purchased with drug proceeds;
   d. Photographs, videos, and/or messages involving or about firearms and ammunition;
   e. Messages, notes, correspondence, and/or communications between drug trafficking sources, customers, associates, and/or co-conspirators;
   f. Any information related to sources of drugs (including names, addresses, phone numbers, or any other identifying information);
   g. Any information recording SALOMON and ASTORGA's schedule or travel; and
   h. All bank records, checks, credit card bills, account information, and other financial records.

27. The **Subject Devices** are currently in the lawful possession of HSI at 5441 Watson Drive SE, Albuquerque, NM. As described above, **Subject Devices** came into the possession of HSI subsequent to the arrest of SALOMON and ASTORGA on November 25, 2023. HSI took possession of the **Subject Devices** on November 25, 2023, after SA Avila attempted a custodial interview with both SALOMON and ASTORGA. In my training and experience, I know that the **Subject Devices** have been stored in a manner in which its contents are, to the extent material to this investigation, in substantially the same state as they were when the **Subject Devices** first came into the possession of HSI.

## TECHNICAL TERMS

28. Based on my training and experience, I use the following technical terms to convey the following meanings:

   a. Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

   b. Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

   c. Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the

      model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d. GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records of the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e. PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

f. Tablet: A tablet is a mobile computer, typically larger than a phone yet smaller than a notebook, that is primarily operated by touching the screen. Tablets function as wireless communication devices and can be used to access the Internet through

cellular networks, 802.11 "wi-fi" networks, or otherwise. Tablets typically contain programs called apps, which, like programs on a personal computer, perform different functions and save data associated with those functions. Apps can, for example, permit accessing the Web, sending and receiving e-mail, and participating in Internet social networks.

g. IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by devices that access the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every device attached to the Internet must be assigned an IP address so that Internet traffic sent from and directed to that device may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some devices have static—that is, long-term—IP addresses, while other devices, particularly mobile devices, have dynamic—that is, frequently changed—IP addresses.

h. Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

29.  Based on my training, experience, and research, and from consulting the manufacturer's advertisements and product technical specifications, available online (for the **Subject Devices)**, I know that the **Subject Devices** have capabilities that allow them to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, PDA, and/or tablet, and to access the Internet. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

### ELECTRONIC STORAGE AND FORENSIC ANALYSIS

30.  Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on such devices. This information can sometimes be recovered with forensics tools.

31. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the **Subject Devices** were used, the purpose of that use, who used them, and when. There is probable cause to believe that this forensic electronic evidence might be on **the Subject Devices** because:

   a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

   b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

   c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

   d. The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

   e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

32. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the **Subject Devices** consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many

parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

33. *Manner of execution.* Because this warrant seeks only permission to examine devices already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## **CONCLUSION**

34. I submit that this affidavit supports probable cause for search warrants authorizing the examination of the **Subject Devices** described in Attachment A to seek the items described in Attachment B.

35. AUSA Timothy Vasquez reviewed and approved this affidavit.

Respectfully submitted,

_____
Victor Avila
Special Agent
Homeland Security Investigations

Telephonically sworn and electronically signed
on November 29, 2023:

_____
Jennifer M. Rozzoni
United States Magistrate Judge

# ATTACHMENT A

## Items to be Searched

The property to be searched are one black Motorola Phone cell phone bearing IMEI 354812420880668 and one black Samsung cell phone with an unknown IMEI, hereinafter referred to as the "**Subject Devices**." The **Subject Devices** are located at the HSI Albuquerque field office located at 5441 Watson Drive SE, Albuquerque, NM.

This warrant authorizes the forensic examination of the **Subject Devices** for the purpose of identifying the electronically stored information described in Attachment B.



**Black Motorola Cell Phone Bearing IMEI 354812420880668**



**Black Samsung Cell Phone with an Unknown IMEI**